### In re CORDOVA SHOP.

(District Court, W. D. New York. August 5, 1914.)

1. CORPORATIONS (§ 28*)—ORGANIZATION—DE FACTO CORPORATION—USER.

Certain individuals contemplating engaging in the leather goods business intended to form a corporation, and for that purpose filed with the secretary of state a certificate of incorporation, paying the tax or fees for that purpose. No stock certificates were issued, or regular meetings of stockholders or directors called, and no reports were filed; nor was the certificate filed and recorded in the office of the clerk of the county wherein the business was conducted until October 22, 1909. In the meantime, however, the corporation commenced to manufacture and sell goods, and claimant did some work for it, and advanced money for its business, which was legitimately used in the business to pay maturing pay rolls, purchase supplies, and pay debts generally. *Held*, that the organization was a corporation de facto, and hence capable of assuming a liability for such advances.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 26, 70; Dec. Dig. § 28.*]

2. BANKRUPTCY (§ 340*)—CORPORATIONS—CLAIMS—ADVANCES.

In bankruptcy proceedings against a corporation, evidence *held* to require a finding that claimant made certain advances to the corporation to assist in carrying on its business, and that the advances were not made to one of the promoters under his agreement with his copromoters to finance the corporation.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

In Bankruptcy. In the matter of bankruptcy proceedings of the Cordova Shop. On application to review a referee's order disallowing the claim of Andrew B. Brown. Reversed.

George C. Riley, of Buffalo, N. Y., for trustee.

Frank A. Abbott, of Buffalo, N. Y., for claimant.

HAZEL, District Judge. The asserted claim is for money loaned the Cordova Shop, adjudicated a bankrupt July 29, 1913, before the completion of its incorporation, and is represented by a promissory note dated October 26, 1909, and signed by the president and sec-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

retary after the legal perfection of incorporation. Upon objection by the trustee to the allowance of the claim in question, testimony pro and con was taken before the referee in bankruptcy upon the questions of the liability of a de facto corporation for money loaned it, and for labor and services performed for it, and upon the effect, in the way of ratification or affirmance of corporate indebtedness, of the delivery to the claimant of a promissory note as security. The trustee claims that the money was advanced by Brown to Lake, the president of the corporation, individually, to enable him to fulfill his contract with his associates, Kranz and Hilt, also officers of the Cordova Shop, to finance the company.

[1] The voluminous record submitted discloses a confusion of ideas, as well as a conflict in some important particulars between the testimony of the claimant and the erstwhile officers of the bankrupt; but, were it not that I think the referee has drawn unwarranted inferences herein, and based his conclusions on an error of law and mistake of fact, I should consider it unnecessary to restate any portion thereof. Briefly, however, the evidence shows that in November, 1908, the witnesses Lake, Hilt, and Kranz entered into an agreement in writing whereby each was to contribute property or money to the assets of a company to be organized and incorporated by them under the name Cordova Shop to engage in the leather goods business in the city of Buffalo. It was clearly the intention of the said witnesses to form a corporation, for on November 4, 1908, in accordance with the provision of the statute, they filed with the secretary of state a certificate of incorporation wherein Lake, Kranz, and the claimant, Brown, were described as directors. The capital stock of the company, as stated therein, was $25,000, and the corporation tax or fees were duly paid. No stock certificates were issued, no regular meetings of stockholders or directors were called, and no reports were filed. Neither was there at that time a strict compliance with the requirements of the statute relating to the filing and recording of certificates; no certificate of incorporation being filed in the office of the clerk of the county wherein the business was conducted until October 22, 1909.

It appears, however, that immediately after filing the certificate of incorporation with the secretary of state the company commenced the manufacture and sale of leather goods; Lake being regarded as the president and his associates, Kranz and Hilt, as vice president and secretary, respectively. The capital stock of the corporation was not issued until October, 1909, when the incorporation of the company was finally completed. Immediately after business was engaged in, the claimant, Brown, did some carpenter work for the company and advanced between $4,000 and $5,000 for its benefit, which was legitimately used in the business in meeting maturing pay rolls, in purchasing supplies, and in the payment of its debts generally.

[2] The claimant substantially testified that he had known Lake for 25 or 30 years previous to the incorporation of the company; that Lake came to him in 1908 and stated that it was his intention to associate himself with Hilt and Kranz in the leather goods busi-

ness; that afterwards he was introduced by Lake to Hilt and Kranz, and stated to them that he would loan Lake and "these young men" $1,500 to organize the business. He swore that he did not at this time, or at any time before the bankruptcy, know of a contract between Lake and his two associates in accordance with which the former was to finance the enterprise, while the latter were to contribute their patterns and formulas to the business. As there was much criticism of his testimony, due, perhaps, to the asperity with which he replied to questions put to him, it may not be inapt to quote a portion of his examination, to which, after all, we must look to ascertain his state of mind at the beginning of the transaction.

"A. The first time I think that we met was after the boys had come in to start to work, and I told Mr. Lake that I would loan him and these young men $1,500. Q. That is, him? A. And the three men. Q. Do you know whether they had, at that time, filed their articles of incorporation? A. I didn't know anything about it. I heard since that they had a contract, but I don't remember ever seeing it. Q. That is, they had a contract between themselves? A. Yes; but I didn't know anything about it, except it has been brought up since this trouble has been brought on; and I believe it is here now. I don't know anything about it. I don't think I ever saw it. I told him I would be very glad—just previous to this I had started two or three young men in business— and I told them I 'would be very glad to loan them $1,500; but I wanted my money back sure, and the way they talked there would be no question but I would get it back in a year's time, and they said they wouldn't need any more money than $1,500. Q. Was there any talk at that time about your taking the stock in this company? A. That is not really clear, but as I remember it I told them I didn't want to go into the company; that I had a good business, and if there was any money in it they could make the money. * * * They wanted me to come in, but I didn't want to, and I promised to give them the money as fast as they needed it, and then they called on me to do some work. * * * Q. Then what occurred after that? A. Now, I cannot tell which one came down; but at different times they said they had to have money for pay rolls, and a few times they came and got money for either material or debts they had to pay. Q. And would different members come; that is, sometimes Kranz and sometimes Lake, and sometimes Hilt? A. Yes; and sometimes I would go down there when I was downtown, and I gave it to whoever was there. I gave all those other moneys after rather under protest, because I only agreed to give them $1,500, and I gave it under protest, because they thought they could start their business nicely on that amount of money."

It does not clearly appear that any of the incorporators were aware that the requirements of the statute with respect to incorporation had not been fully complied with, except that the witness Hilt testified that subsequently to the filing of the certificate in the office of the secretary of state the corporation was "hanging in the air," and there was a question "whether the business was worth while organizing." But this is immaterial, and the presumption, in view of the circumstances, is strongly in favor of an honest intention to form a corporation. That processes and patterns were contributed by the witnesses Hilt and Kranz, and were actually used in business carried on under the corporate name specified in the certificate of incorporation, that bank accounts were carried in the corporate name, and business conducted thereunder, is not disputed, and indicate a bona fide intention and attempt to form a corporation. Incorporation was concededly incomplete, because of failure to fulfill all the statutory

requirements; but user, accompanied by all the essentials of a de facto corporation, is to my mind clearly shown. Methodist Episcopal Union Church v. Pickett, 19 N. Y. 482; Emery v. DePeyster, 77 App. Div. 65, 78 N. Y. Supp. 1056; Eaton v. Aspinwall, 19 N. Y. 119; Raisbeck v. Oesterricher, 4 Abb. N. C. (N. Y.) 444.

A subscriber to the capital stock of the company no doubt could have been held on his subscription, even though the statute relating to incorporation was not fully complied with; and why the claimant, who paid the bills and performed labor for the company at the request of the incorporators in the early period of its attempted organization should not have his claim allowed, is not apparent, unless it can be clearly established that he did in fact loan the money to Lake on his personal liability. It is not proven that such was his intention, although it must be conceded that equivocal testimony on this point was drawn from the witnesses Lake and Kranz. But nowhere in the record is shown more than a surmise or suspicion that the claimant was aware of Lake's arrangement with his associates to finance the company, or that throughout the initial stages of the transaction he looked to Lake individually for repayment. It is true that Lake testified that on March 16, 1909, he gave his personal note to cover advances previously made by Brown, and that thereupon he credited to himself on the books of the company the sum of $4,300, the amount of such advances by Brown; but Brown denies accepting the personal note of Lake in satisfaction of his claim, and asserts the subsequent voluntary delivery to him of the promissory note of the corporation, which would seem to confirm his refusal of the Lake note. Certainly he should not be held responsible for Lake's acts of apparent duplicity, unless the evidence clearly indicates that they were with his sanction and because of Lake's individual liability to him.

Both Brown and Lake testified that there was an understanding in the beginning that the former should have the option of taking shares of stock for his indebtedness; but it is not disputed that subsequently, in January, 1909, Brown decided not to take any shares of stock, but to require a return of his money. Upon this subject Lake testified as follows:

"Q. And that was the arrangement with him. He had his option. You were going to have a large amount of the stock, and you gave him the option of either taking stock in the company or taking your individual note and you keep the stock. That was your arrangement? A. No; the option was to take stock, or that we were to pay for the work he had done for us and the moneys he had advanced. Q. And you were the one that was to do the paying? A. As president of the company. Q. As an individual? A. No; I wouldn't say that. Q. You gave him your individual note, didn't you? A. Yes. Q. Why did you give him your individual note? A. Well, the matter was still, at that time, in such shape that we knew we had to have more money from Mr. Brown. Q. This wasn't to get more money. This was to pay up the amount that had been advanced, wasn't it? A. It was to be his security for it."

So that, even if it be assumed herein that a personal note was given, it appears to have been fairly regarded by the maker as collateral security for an indebtedness of the company for which it was primarily liable. The witness Hilt swore that he supposed Lake had given his

personal note for the debt; that when he learned from the book-keeper that the company had paid interest thereon he made inquiries, and the bookkeeper, in the absence of Brown, said it was a personal note of Lake's; and that later he was informed by Lake that as the money from Brown was put into the business the note should in fact have been a Cordova Shop note. Such testimony, properly interpreted, would seem to negative the conclusion that the loans and advances were not made to the company.

It was further held by the referee that the promissory note in question, upon which subsequently $1,000 and interest were paid by the corporation, was without consideration, and hence not binding upon it. The evidence fairly shows that when the incorporators became aware of the incompleteness of the incorporation proceedings they took steps to complete the same. Meetings were held by the directors, shares of stock were issued, officers formally elected, and a duplicate certificate of incorporation was filed in the county clerk's office. The prior advances of Brown and his request for a note were discussed. No adequate reason is discoverable for disbelieving the testimony of Mr. Houpt upon this subject, or for failing to give it proper weight. His narrative of the occurrence discloses no repudiation of Brown's claim, but, on the contrary, shows express recognition thereof, and unanimous agreement among the incorporators to execute and deliver the promissory note in question. It is inconceivable that Kranz and Hilt would not at such a time have interposed objections to making the company responsible, if in fact the loans were not for its benefit, but were merely to enable Lake to fulfill his agreement to finance the company or to contribute to the capital stock. They had been faithful to their contractual engagement, and in my opinion would not have supinely acquiesced in making the corporation responsible if no sufficient consideration had been received by it. Even though the note was not executed and delivered on the day it bears date, its subsequent execution and delivery, as testified to by the witness Hilt, were nevertheless, I think, in good faith and for the benefit of the corporation.

Counsel for the trustee criticizes the use of the personal pronoun "I" in the body of the note, inferring therefrom that the note was not originally made as a corporation note, but was afterwards changed to transfer Lake's liability to the corporation. There are, however, no facts in support of the argument; Houpt testifying, in explanation of the wording of the note, that he invariably used the pronoun "I" when drawing a corporation note.

It is also contended that the acceptance of 398 shares of stock at the time of making the note militates against its validity. Such collateral concededly added little to the security of the note, unless the payee attached importance to the personnel of the officers of the corporation; but these are incidental details, which should not weigh against the claimant and his repeated assertion that he at all times looked to the company for a repayment of the advances made by him.

My conclusion is that the note, subject to the amount paid on account, should be allowed, and the decision of the referee reversed.